UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**LINDA COMPTON,**

    Plaintiff,

v.                                           CASE NO. 8:08-CV-808-T-EAJ

**MICHAEL J. ASTRUE,**
**Commissioner of Social**
**Security Administration,**

    Defendant.
_____ /

## **FINAL ORDER**

Plaintiff brings this action pursuant to the Social Security Act (the "Act"), as amended, Title 42, United States Code, Sections 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").[1] The undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge ("ALJ"), the administrative record, and the pleadings and memoranda submitted by the parties in this case.[2]

In an action for judicial review, the reviewing court must affirm the decision of the Commissioner if it is supported by substantial evidence in the record as a whole and comports with applicable legal standards. See 42 U.S.C. § 405 (g). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler,

---

[1] Although Plaintiff states that she also applied for Supplemental Security Income, the ALJ's decision addresses only Disability Insurance Benefits. (T 320-33) In any event, the standards are the same except for the DIB date of last insured which is not at issue in this appeal.

[2] The parties have consented in this case to the exercise of jurisdiction by a United States Magistrate Judge (Dkt. 33).

703 F.2d 1233, 1239 (11th Cir. 1983). If there is substantial evidence to support the Commissioner's findings, this court may not decide the facts anew or substitute its judgment as to the weight of the evidence for that of the Commissioner. See Goodley v. Harris, 608 F.2d 234, 236 (5th Cir. 1979) (citations omitted).[3]

If the Commissioner committed an error of law, the case must be remanded to the Commissioner for application of the correct legal standard. See Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993). If the reviewing court is unable to determine from the Commissioner's decision that the proper legal standards were applied, then remand to the Commissioner for clarification is required. See Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987).

**Background**

On April 16, 1999, and January 28, 2003, Plaintiff filed applications for DIB, alleging disability beginning on February 20, 1999.[4] (T 320-21) Plaintiff alleges disability due to a seizure disorder, arthritis, back pain, headaches, and depression. (T 321) Plaintiff's claim was denied initially and upon reconsideration. Following a December 4, 2000 administrative hearing, the ALJ denied Plaintiff's application. (T 11-23) Plaintiff appealed to this court, and on April 23, 2004, the case was remanded to the Commissioner for further consideration of the opinions of Plaintiff's treating physicians. (T 334-38)

The Appeals Council remanded Plaintiff's case to the ALJ (T 341-42), who held additional

---

[3] Decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[4] The Appeals Council determined that Plaintiff's second application was a duplicate of the first and consolidated the two claims. (T 320)

2

hearings on March 3, 2005, October 4, 2005, and October 15, 2005. (T 484-543) The ALJ denied Plaintiff's claim in a January 18, 2006 decision. (T 320-33) The Appeals Council again denied review, making the ALJ's January 18, 2006 decision the final decision of the Commissioner. (306-08) Plaintiff filed a timely petition for judicial review of the Commissioner's denial after exhausting all administrative remedies (Dkt. 1). The Commissioner's decision is ripe for review under the Act.

Plaintiff was sixty-one years old at the time of the ALJ's decision, with a high school education. (T 321) Her past work experience includes work as a waitress and a fabric inspector at a T-shirt factory. (T 332)

To determine if Plaintiff was disabled, the ALJ performed a five-step evaluation. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 20, 1999, the alleged onset date, and that Plaintiff met the insured status requirements through September 30, 2003.[5] (T 321-22) Second, while Plaintiff suffered from a severe combination of impairments, including psychogenic non-epileptic seizures, cervical and lumbar degenerative disc disease ("DDD"), obesity, anxiety, and depression, these impairments, whether considered singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. (T 328) Third, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of medium work.[6] (T 332) Fourth, based on Plaintiff's RFC, the ALJ found that Plaintiff was capable of performing her past work as a waitress and as a

---

[5] This is Plaintiff's Date of Last Insured ("DLI"). Plaintiff must establish that she was disabled between the alleged onset date and the DLI.

[6] The ALJ specifically found that Plaintiff "retained the residual functional capacity to perform medium work, with an occasional limitation for bending, stooping, crouching, and kneeling, with a frequent limitation for working around dangerous machinery and at unprotected heights, in an environment without extremes of temperature, and involving routine, repetitive tasks." (T 332)

3

fabric inspector. (Id.) In reaching this conclusion, the ALJ considered the testimony of vocational expert ("VE") Irvin Roth. (Id.) Accordingly, the ALJ concluded that Plaintiff was not disabled at any time through the date of the decision and denied Plaintiff's claim for DIB under the Act.

The medical evidence has been summarized in the decision of the ALJ and will not be repeated here except as necessary to address the issues presented.

## Discussion

Plaintiff argues the ALJ erred by (1) improperly weighing Plaintiff's treating and consultative physicians' opinions; (2) improperly evaluating the combined effect of Plaintiff's impairments; and (3) dismissing Plaintiff's subjective complaints of pain (Dkt. 30).

## I. Treating Physicians' Opinions

Plaintiff submits that the ALJ improperly weighed the opinions of her treating psychiatrists, Joseph Rawlings, M.D. ("Dr. Rawlings") and Dr. Choskey (Id. at 18).[7] Plaintiff also contends that the ALJ misconstrued the records of her treating neurologist, William Tatum, M.D. ("Dr. Tatum), and, consequently, weighed too heavily the opinions of consultative psychologists Tracey Henley, Psy.D. ("Dr. Henley") and Richard Carpenter, Ph.D. ("Dr. Carpenter") (Id. at 19).

The testimony of a treating physician must be given substantial or considerable weight unless good cause is shown to the contrary. MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986). Good cause exists where a physician's opinion is not bolstered by the evidence, the evidence supports a contradictory finding, or the opinion is conclusory or inconsistent with the physician's own medical records. Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004). An ALJ must articulate specific reasons, supported by substantial evidence, for failing to give the opinion of a

---

[7] Dr. Choskey's first name cannot be deciphered. (T 192-94)

treating physician controlling weight. Davis v. Astrue, 287 F. App'x 748, 753 (11th Cir. July 9, 2008) (citation omitted) (per curiam) (unpublished).

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the opinion based on the nature and extent of the treatment relationship, medical evidence supporting the opinion, consistency with the record as a whole, and other factors. 20 C.F.R. § 404.1527(d).

### A.     Drs. Rawlings and Choskey

In June 1998, Plaintiff was hospitalized with multiple seizures after overdosing on antidepressants and alcohol in a suicide attempt. (T 168) Plaintiff informed the hospital staff that she had attempted suicide when she lost her temper at her son and daughter-in-law. (T 168-69) In 1999, as the ALJ noted, Plaintiff was treated by Dr. Choskey for three mandatory outpatient visits. (T 192-93, 322) The ALJ recounted this treatment, noting the psychiatrist's observation that Plaintiff appeared nervous, depressed, and anxious. (T 322)

In accordance with his duty to weigh the evidence, the ALJ considered Dr. Choskey's opinion as one of Plaintiff's treating physicians. (T 322, 330) Dr. Choskey's records do not support a finding of disability. Dr. Choskey reported Plaintiff's lack of sleep and crying fits and prescribed Zoloft and Trazodone. (T 192) In April 1999, as stated in the ALJ's opinion, Dr. Choskey described Plaintiff's depression was "ok". (Id.) Dr. Choskey made no diagnosis and did not mention any functional limitations. In addition, Dr. Choskey's opinion is consistent with other evidence in the record, discussed below, which indicates Plaintiff suffered from depression and non-epileptic seizures, among other impairments, but otherwise could perform her daily activities. Dr. Choskey's findings also are consistent with those of Plaintiff's other treating physicians, including Joel Laborde, M.D. ("Dr. Laborde"), Plaintiff's primary care physician and the only physician who

5

treated Plaintiff from March 2000 through September 2001. (T 440-53) The ALJ gave Dr. Laborde's opinions great weight. (T 331) Dr. Laborde prescribed Plaintiff various anti-depressants over the course of his treatment (which stopped in 2005) but otherwise noted Plaintiff was "overall doing well." (T 436)

The ALJ's consideration of Dr. Rawlings's treatment notes is similarly supported by substantial evidence. Dr. Rawlings saw Plaintiff four times between June 1999 and September 1999. (228-29) Plaintiff reported that she was not sleeping well, was overeating, and had a diminished sex drive. (Id.) Dr. Rawlings prescribed Prozac and Alprazolam, among other medications. (T 228) His brief treatment notes summarize Plaintiff's reports of non-epileptic seizures and memory loss. (T 229) Plaintiff reported to Dr. Rawlings that she had trouble paying attention to television, could not focus long enough to read, and was not permitted to return to her job due to her seizures. (Id.) Beyond this recitation of Plaintiff's limitations, however, Dr. Rawlings did not offer any findings as to Plaintiff's mental impairments. (T 228-29) In December 2000, more than a year after the date of his last treatment note, Dr. Rawlings wrote a short letter to Plaintiff's counsel stating that Plaintiff was "100% disabled." (T 285) On that date Dr. Rawlings also completed a mental RFC form for Plaintiff on which he checked boxes indicating that Plaintiff's ability to complete a normal workday and workweek was markedly limited. (T 286-87)

The ALJ noted Dr. Rawlings's treatment of Plaintiff and Dr. Rawlings's opinion that Plaintiff is disabled but rejected it as inconsistent with the psychiatrist's own treatment notes and the reports of Dr. Tatum, Dr. Laborde, Antonio Castellvi, M.D. ("Dr. Castellvi"), Plaintiff's orthopedic surgeon, and Edwin Colon, M.D. ("Dr. Colon"), Plaintiff's pain management specialist. (T 330)

First, the ALJ pointed out that Dr. Rawlings's treatment records do not document any

findings as to Plaintiff's mental functioning and merely recite Plaintiff's subjective complaints. (T 330) Dr. Tatum, who treated Plaintiff over a longer period of time and whose treatment notes contain detailed findings as to Plaintiff's limitations, communicated once with Dr. Rawlings regarding Plaintiff's medications and seizure disorder. (T 253) Dr. Tatum did not place Plaintiff on any work restrictions beyond those associated with the average seizure patient.[8] (Id.)

Second, from March 2000 through September 2001, after discontinuing treatment with Dr. Rawlings, Dr. Laborde treated Plaintiff over approximately eight times. (T 440-53) Dr. Laborde treated Plaintiff's DDD and anxiety and prescribed Plaintiff antidepressants. (Id.) He made no note of Plaintiff's memory loss or associated seizures; Plaintiff's complaints were of neck and back pain. Plaintiff's examinations were otherwise unremarkable. (Id.) Dr. Laborde continued to treat Plaintiff through March 2005, and at no point during his treatment did he assess Plaintiff with work-related restrictions. (T 424-40)

The treatment records of Drs. Colon and Castellvi also support the ALJ's decision to reject Dr. Rawlings's conclusion that Plaintiff is disabled. Pain management specialist Dr. Colon treated Plaintiff for recurrent neck and back pain from March 2000 through January 2005. (T 282-84, 407-23) He diagnosed DDD and prescribed epidural injections. (T 423) Plaintiff reported headaches to Dr. Colon (T 282), but otherwise Dr. Colon's treatment notes make no mention of Plaintiff's impaired memory or other mental limitations. In fact, on two occasions in 2004, Dr. Colon reported that Plaintiff was "working regularly" and "continues to work" and that this development was "encouraging." (T 409-10) At the administrative hearing, Plaintiff denied working and could not explain Dr. Colon's comments (T 524-25); nevertheless, Dr. Colon's records indicate that Plaintiff's

---

[8] The ALJ accounted for these limitations in Plaintiff's RFC by including "a frequent limitation for working around dangerous machinery and at unprotected heights." (T 332)

impairments were manageable.

Orthopedic surgeon Dr. Castellvi also treated Plaintiff for neck and back pain. (T 276-81) In August 2000, Dr. Castellvi made note of Plaintiff's seizure history but did not prescribe work-related limitations. (T 276-78) Dr. Castellvi determined that Plaintiff had DDD but "full mobility of the neck" (T 276) and suggested Plaintiff obtain a second opinion regarding her request to undergo surgery. (T 279-80)

Finally, the ALJ also rejected Dr. Rawlings's opinion that Plaintiff is disabled based on the report of consultative psychologist Dr. Carpenter who twice performed mental status evaluations of Plaintiff and concluded that Plaintiff was malingering. (T 209-13, 230-34, 330) Although the opinion of a consultative examiner is entitled to less weight than that of a treating physician, <u>Wilson v. Heckler</u>, 734 F.2d 513, 518 (11th Cir. 1984) (citation omitted), the ALJ did not rely solely on Dr. Carpenter's conclusions in rejecting those of Dr. Rawlings, contrary to Plaintiff's suggestion (<u>see</u> Dkt. 30 at 22). The ALJ had good cause to reject Dr. Rawlings's opinion; his decision is supported by substantial evidence.

  **B. Dr. Tatum**

Plaintiff argues that the ALJ improperly deduced that Plaintiff was malingering from Dr. Tatum's conclusion that Plaintiff's seizures were non-epileptic (Dkt. 30 at 23). To the contrary, the ALJ appropriately characterized Dr. Tatum's records in determining that Plaintiff is not disabled.

As the ALJ noted, Plaintiff was initially treated by neurologist Eddy Berges, M.D. ("Dr. Berges") after her suicide attempt. (T 329) Dr. Berges ordered an electroencephalogram ("EEG") test that revealed "abnormal" results. (T 198) The EEG showed "an extensive amount of fast activity with a drug-induced fast rhythm. There is no evidence of epileptiform discharge compatible with the diagnosis of a seizure disorder." (T 198) On March 29, 1999, Dr. Berges prescribed

Dilanton and urged Plaintiff not to drive. (T 197) Due to this restriction, Dr. Berges concluded that Plaintiff "has to be out of work." (Id.) He did not specify a time period, but directed that she return in a month. (Id.) After Plaintiff reported seizures during her sleep during an April 1999 visit with Dr. Berges, the neurologist ordered Plaintiff to seek a second opinion as to the nature of her seizure disorder. (T 195)

In May 1999, Plaintiff began treatment with Dr. Tatum, who diagnosed non-epileptic seizures. (T 261) Plaintiff told Dr. Tatum that she had multiple seizures a week with associated slurred speech, clonic jerking, tongue lacerations, eye rolling, and urinary incontinence. (T 259) EEG monitoring captured Plaintiff having a seizure in her sleep. Dr. Tatum advised Plaintiff to avoid driving, heights, swimming alone, and working near electrical outlets or with heavy machinery. Dr. Tatum otherwise did not discuss any limitations due to Plaintiff's seizure disorder. (T 256)

In September 1999, during a follow-up visit, Plaintiff had a seizure in Dr. Tatum's office that was "clinically consistent with nonepileptic seizure." (T 253) The seizure consisted of "violent asymmetric bilateral arm flailing with side-to-side head movements." (Id.) Following this episode, Dr. Tatum consulted Dr. Rawlings, but did not impose any work-related restrictions on Plaintiff beyond the usual seizure precautions. (T 253) Dr. Tatum stopped treating Plaintiff in January 2000 due to Plaintiff's financial constraints. However, during Plaintiff's last visit to Dr. Tatum, Plaintiff complained of a seizure the previous week; she reported, however, that she had "gotten better in terms of her speech." (T 304) Further, Plaintiff "noted no memory problems." (Id.)

The ALJ properly evaluated Dr. Tatum's findings as a treating physician. (T 329) After summarizing Dr. Tatum's records, the ALJ observed: "Dr. Tatum did not indicate that Plaintiff was disabled and unable to work, but advised the claimant only to avoid driving heights, and machinery."

(T 329) The ALJ noted the non-epileptic origin of Plaintiff's seizure as an explanation of why Dr. Tatum did not prescribe Dilantin, an epilepsy medication, not as a suggestion that Dr. Tatum doubted Plaintiff's seizures. (Id.) In weighing Dr. Tatum's findings, the ALJ stated that "[a]s of the last documented visit with Dr. Tatum, in September 2000, the claimant reported that she was better; she no longer had memory problems; and her stuttering speech was resolved." (Id.)

Plaintiff submits that in analyzing Dr. Tatum's findings, the ALJ relied too heavily on the mental status examinations completed by consultative psychologists Dr. Henley and Dr. Carpenter (Dkt. 30 at 22). Dr. Henley performed memory testing on Plaintiff in 2005. (T 462-66) Dr. Henley concluded that the test results were invalid because Plaintiff "put forth little effort during formal testing." (T 465) As a result, Dr. Henley found that "the possibility of malingering cannot be ruled out." (Id.) This opinion, as well as Dr. Carpenter's assessment, informed the ALJ's ultimate determination. (T 327-28, 330) As discussed above, however, the ALJ analyzed the opinions of Plaintiff's treating physicians as well in reaching his conclusion that Plaintiff is not disabled. The ALJ's consideration of the opinions of Plaintiff's treating physicians was not in error.

## II.     Combined Effects of Plaintiff's Impairments

Plaintiff contends that the ALJ failed to consider Plaintiff's seizure disorder (and her post-seizure fatigue, headaches, confusion, and memory loss), depression, anxiety, and dementia in combination (Dkt. 30 at 27). Plaintiff also alleges that the ALJ did not consider her neck and back pain in determining that Plaintiff is not disabled (Id.)

The ALJ must explain whether a claimant's impairments are severe singularly and in combination. Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986). The combined effect of a claimant's impairments must be considered even if any of the impairments considered separately are not "severe". Hudson v. Heckler, 755 F.2d 781, 785-86 (11th Cir. 1985). The failure to comply

with these requirements results in a remand. Gibson, 779 F.2d at 623.

The ALJ's decision reflects that he considered all of the impairments raised by Plaintiff that were supported by medical evidence in the record. The ALJ stated that Plaintiff had "psychogenic nonepileptic seizures, cervical and lumbar degenerative disc disease, obesity, anxiety, and depression, a combination of impairments that was severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (T 328) (emphasis added) This language has been held sufficient to discharge the Commissioner's obligation to consider the impairments in combination. See Wilson v. Barnhart, 284 F.3d 1219, 1224-25 (11th Cir. 2002) (ALJ's statement that claimant did not have a "combination of impairments" that constituted a severe impairment is evidence that the ALJ considered the combined effect of a claimant's impairments).

Moreover, the ALJ elicited testimony from Plaintiff about the tremors in her right hand that intensified before a seizure.[9] (T 44) Plaintiff testified that her tremors come and go and make it difficult for her to write and hold cups. (T 496) She testified to having up to three grand mal seizures a month that lasted from five to ten minutes and required her to sleep for four to eight hours afterwards. (T 494-95) When the ALJ asked Plaintiff how her seizures have impacted her memory and concentration, Plaintiff testified to gaps in both her long-term and short-term memory: "I don't remember anything about my childhood. I have trouble remembering dates and stuff regularly." (T 49) She also stated that she could not remember a book she had just read. (T 50) Plaintiff's medications made her feel disoriented and slowed her reaction time. (T 498) She struggled with a seizure-related stutter that sometimes made it difficult for her to talk. (T 498-99) Regarding her

---

[9] At Plaintiff's request, Plaintiff's testimony from her December 2000 hearing (T 27-70) was incorporated into the transcript of the March 2005 hearing. (See T 491)

11

depression, Plaintiff testified that she "just get[s] depressed being home all the time because I'm not used to it" (T 48) and "I just don't talk good to people." (T 500)

The ALJ discussed this testimony and Dr. Tatum's treatment records which document Plaintiff's complaints of stuttering speech, decreased response time, and a right arm tremor. (T 325) The ALJ also addressed Dr. Rawlings's notes documenting Plaintiff's complaints of difficulty concentrating and memory loss. (T 323) The ALJ's opinion analyzed in detail the records of Drs. Laborde, Castellvi, and Colon, who each treated Plaintiff over several years and did not note any problems with Plaintiff's mental functioning. (T 330) Dr. Carpenter's assessment of Plaintiff's limitations relating to seizures, memory loss, depression, anxiety, and anger also informed the ALJ's decision. (T 324) Thus, Plaintiff's argument that the ALJ did not consider these impairments in combination is unsupported.

Plaintiff's argument that the ALJ did not consider her neck and back pain is also incorrect. First, the ALJ accounted for neck and back pain in formulating Plaintiff's RFC to include limitations on "bending, stopping, crouching, and kneeling." (T 332) Second, the ALJ assigned great weight to the records of Dr. Colon, who treated Plaintiff's for her neck and back pain. (T 330-31) The ALJ noted the length of Dr. Colon's treatment history with Plaintiff – from March 2000 through January 2005 – and that his treatment notes reflect Plaintiff's complaints of recurrent pain. (T 330) The ALJ also observed, however, that Dr. Colon did not assign Plaintiff any work restrictions at any point. (T 331)

Thus, Plaintiff has not shown that the ALJ's consideration of Plaintiff's combination of impairments was in error.

### III. Plaintiff's Subjective Complaints of Pain

Plaintiff also briefly contends that the Commissioner improperly discounted Plaintiff's

complaints of pain and mental limitations (Dkt. 30 at 26-29). Plaintiff argues that the ALJ's decision to discredit her testimony as well as that of her father and son was error because this testimony was consistent with the records of Plaintiff's treating physicians (Id. at 28-29).

The Eleventh Circuit applies a three part "pain standard" when evaluating subjective complaints of pain. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (per curiam). Under this standard, the plaintiff must produce (1) evidence of an underlying medical condition, and either (2) objective medical evidence confirming the severity of the pain resulting from the medical condition, or (3) evidence that the condition is so severe that it can reasonably be expected to cause the alleged pain. Id.

Where an ALJ declines to credit a claimant's testimony as to pain, the ALJ must articulate explicit and adequate reasons for doing so. Id. at 1561. A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court. Id. A lack of an explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. Id. (citation omitted).

In this case, the ALJ held:

> The evidence does establish the presence of underlying impairments that reasonably could be expected to produce the symptoms alleged. However, the claimant's statements as to the frequency, intensity, and duration of her symptoms are inconsistent with the evidence of record and cannot be fully credited.

(T 328) The ALJ found that due to the inconsistency of the Plaintiff's statements to her physicians, "the evidence of malingering, the lack of support of the claimant's allegations by the objective medical evidence, and the evidence that the claimant had been working, I find that the claimant's and her father's and son's testimony is not credible." (T 331) This finding is clearly articulated and supported by substantial evidence.

13

Plaintiff's medical and personal history are difficult to piece together due to the inconsistent statements Plaintiff made to medical personnel.[10] As the ALJ noted, Plaintiff mentioned to Dr. Carpenter in July 1999 that she had a stroke earlier in the year and was brought to an emergency room. (T 210, 329) However, during a September 1999 treatment session with Dr. Rawlings, Plaintiff mentioned a seizure that resulted in an emergency room trip earlier in the year, but she did not provide any history of a stroke. (T 228) During a disability evaluation in February 2000, Plaintiff stated that she had a stroke two years earlier that caused memory loss, seizures, and hand tremors. (T 262) However, there is no medical documentation of a stroke.

Further, Plaintiff mentioned to Dr. Colon that she fell off a porch in 1999 and suffered injuries to her neck and back; yet, there is no evidence of this fall or of fall-related injuries. (T 282) In June 2004, Dr. Colon wrote (after Plaintiff's office visit) that "[b]ecause [Plaintiff] is working regularly, she is having difficulty resorting to her usual medication." (T 410) In August 2004, Dr. Colon noted that Plaintiff "continues to work and this is encouraging because she has not let up." (T 409) However, Plaintiff denied working when questioned by the ALJ. (T 524-25) Also, Dr. Henley noted Plaintiff's statement that she is capable of taking care of herself and completing her activities of daily living. (T 464) Yet, Plaintiff and her father and son testified that she is unable to care for herself due to the seizures.[11] (T 56-62, 530-31)

---

[10] These inconsistencies range from Plaintiff's statement to emergency room personnel in 1998 that she was a transsexual and was in the process of having a sex change (T 168) to Plaintiff's testimony that she cannot remember either her childhood or a book she just read (T 49-50) although in September 2000, Dr. Tatum wrote that Plaintiff "has noted no memory problem." (T 304)

[11] The record is replete with more examples of Plaintiff's inconsistent statements: Plaintiff told Dr. Tatum that she has five children (T 260) but reported to Dr. Henley that she had three children who were all raised by her second husband. (T 462) However, at her March 2005 hearing, Plaintiff stated that she "raised three boys." (T 502) Plaintiff told Dr. Henley that she does not have a high school education (T 462) but testified at her March 2005 hearing that she does. (T 491)

As further examples of the inconsistency of the proffered testimony, Plaintiff's son testified that while Plaintiff lived with him, he witnessed one of Plaintiff's seizures that lasted "at least 40 minutes." (T 505) During a January 2000 office visit with Dr. Tatum, however, Plaintiff's husband recounted that her seizures lasted between three and five minutes, (T 252) and Plaintiff's father, who also lived with Plaintiff and accompanied her on her appointments with Dr. Tatum, approximated the lengths of Plaintiff's seizures between three and ten minutes. (T 255, 259) Moreover, on January 18, 2000, Plaintiff's husband told Dr. Tatum that Plaintiff was having one to two seizures per week (T 252); on January 26, 2000, Plaintiff's father related to Dr. Tatum that Plaintiff had not had a seizure in three to four weeks. (T 250)

In discrediting Plaintiff's testimony, the ALJ highlighted these and other discrepancies as well as Dr. Tatum's note during a June 2000 neurological exam that he "suspect[ed] a component of emotional overlay" to Plaintiff's complaints of a right hemisensory deficit. (T 302, 329) The ALJ also emphasized Dr. Henley's statement that "the possibility of malingering could not be ruled out" (T 465) and Dr. Carpenter's "suspicion that [Plaintiff] may be malingering." (T 211)

Regarding Plaintiff's father's and son's testimony, the ALJ stated:

> The claimant's father and son testified that they had witnessed the claimant's seizures, but both reports covered a very limited period of time when they lived with the claimant and the claimant's father stated that he had not heard of any instance when the claimant experienced a seizure when there was no one there to care for her. The claimant testified that she needed 12 hours to recover from a seizure; the claimant's father testified that the claimant slept for about an hour after a seizure.

(T 331) The ALJ discussed these inconsistencies in light of other evidence summarized above in concluding that Plaintiff's "father's and son's testimony is not credible." (Id.)

The ALJ clearly articulated his credibility determination as to Plaintiff, her husband, and her son; the ALJ emphasized the inconsistencies between the medical records and the testimony. The

15

ALJ's credibility determination is based on substantial evidence. See Foote, 67 F.3d at 1561; Allen v. Sullivan, 880 F.2d 1200, 1203 (11th Cir. 1989).

## **Conclusion**

The ALJ's decision is supported by substantial evidence and the proper legal principles. The decision of the Commissioner is therefore affirmed.

Accordingly and upon consideration, it is **ORDERED** that:

(1) the decision of the Commissioner is **AFFIRMED** and the case is **DISMISSED**, with each party to bear its own costs and expenses; and

(2) the Clerk of Court shall enter final judgment in favor of Defendant consistent with 42 U.S.C. §§ 405(g) and 1383(c)(3).

**DONE AND ORDERED** in Tampa, Florida on this 2nd day of September, 2009.

ELIZABETH A JENKINS
United States Magistrate Judge